MAY 10 1974

*out*
*5/10/74*

MEMORANDUM FOR DUDLEY H. CHAPMAN
Associate Counsel to the President

Re: Appointment of a Foreign National to the
National Voluntary Service Advisory Counsel


This responds to your memorandum of April 19, 1974,
inquiring whether any legal problems would be raised by
the appointment of an Iranian national, who is currently
serving as a Political Counselor to the Iranian Ambassador,
to the above-entitled Advisory Council. In our view there
is no statutory barrier to such an appointment. However,
as noted below, Iranian law, diplomatic practice and policy
issues should also be considered before an appointment is
made.

Section 405(a) of the Domestic Volunteer Service Act
of 1973, Pub. Law 93-113, 87 Stat. 394, established the
National Voluntary Service Advisory Council. Its member-
ship is:

> to be composed of not more than twenty five
> members appointed. . . by and serving at the
> pleasure of the President. Such members shall
> be representative of public and private organiza-
> tions, groups and individuals interested in
> serving and benefited by programs carried out
> under this Act and the Peace Corps Act (22 U.S.C.
> 2501 et seq.). . . Members of the Council. . .,
> while attending meetings of such Council shall
> receive compensation and travel expenses as
> provided in section 402(2) of this Act with
> respect to experts and consultants. . . .

There is nothing in this language or any other provision of the Act indicating that foreign nationals are ineligible for appointment. On the other hand, the legislative history rather conclusively shows that such nationals are considered eligible for membership. In explaining the composition of the Advisory Council envisaged in section 405(a), the Senate Report noted:

> The members of the New Council shall be representative of public and private organizations, groups, and individuals interested in serving in programs and being benefited by programs carried out under this Act and the Peace Corps Act. Such members shall include in approximately even numbers representatives of beneficiaries of programs established under this Act, nations hosting Peace Corps volunteers, present and former volunteers, and national coalitions representing such groups. S. Rep. No. 93-311, 93d Cong., 1st. Sess. (1973) (emphasis added).

We have been informally advised by the General Counsel's Office in the Peace Corps that several Peace Corps volunteers are presently serving in Iran. Therefore, we conclude that an Iranian national would not because of the lack of American citizenship be barred, under the terms of Pub. L. 93-113, from membership on this Council.

On the other hand, the effect upon this appointment of the Constitutional provision prohibiting United States officials from receiving emoluments from foreign States and the requirement of the Civil Service laws that persons appointed to offices of honor or profit under the United States swear an oath of allegiance to the United States is much less clear.*/ Article I, section 9, clause 8 of the Constitution provides:

> No Title of Nobility shall be granted by the United States: And no Person holding any Office of Profit or Trust under them, shall, without the

---

*/ It is clear that the Domestic Volunteer Service Act does not impose any such oath upon National Voluntary Service Advisory Council members.

Consent of the Congress accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State.

Assuming membership on the Voluntary Service Advisory Council constitutes holding an office of trust or profit under the United States and Congressional consent to this appointment is absent, it might be argued that the Iranian national, upon appointment to the Advisory Council, must relinquish his duties as a Political Counselor to the Iranian Ambassador. Such a view certainly finds some support in the literal language of this clause. However, the history of the drafting of this provision casts a different gloss on its import and somewhat diminishes the force of this argument.

It is evident from the debates during the Constitutional Convention and the subsequent State ratification proceedings that this prohibition was deemed necessary to preserve the independence of United States officials from external influence or domination. See II, Farrand, The Records of the Federal Convention of 1787, 389 (1937 ed.). As explained by Governor Randolph during the ratification debate in the Virginia Convention:

> [This] restriction restrains any person in office from accepting of any present or emolument, title, or office, from any foreign prince or state. . . . This restriction is provided to prevent corruption. All men have a natural inherent right of receiving emoluments from any one, unless they be restrained by the regulation of the community. An accident which actually happened, operated in producing the restriction. A box was presented to our ambassador by the king of our allies. It was thought proper, in order to exclude corruption and foreign influence, to prohibit any one in office from receiving or holding any emoluments from foreign state. III Farrand, at 327.

- 3 -

While it is clear that the framers intended to prohibit the receipt of foreign presents or titles once an appointment to an office had been made, it cannot be said with the same degree of certainty that the prohibition was also intended to preclude the appointment of persons who are in the employ of foreign governments before the selection for appointment is made. Because the fact of foreign service would be known to the appointing official and could therefore be evaluated in connection with the duties required by the contemplated appointment and along with whatever other factors deemed pertinent, the prospect that the foreign appointee would therefore be more susceptible to corruption or influence merely by the fact that he already possesses a title or renders services to a foreign state appear slight. Accordingly, it might be argued that this constitutional prohibition is inapplicable to the present situation even if it is assumed that Congress has not consented and that the Advisory Council is an office of trust or profit. Nevertheless, for the reasons discussed immediately below, we do not feel it is necessary to reach this question.

First, there is a substantial question whether membership on the Council constitutes holding an office of profit or trust under the United States within the meaning of the constitutional language. Authorities have split concerning the precise meaning of these words. Examples of offices deemed to fit within these definitions are many and varied. Former Attorney General Ackerman held, for example, that a minister plenipotentiary from our government to a foreign power certainly holds an office of profit and trust under the United States and that the receipt of a similar commission from a third power gives him an office under that power which the Constitution forbids him to accept. 13 Op. Atty. Gen. 537 (1871). Similarly, it has been held that a U.S. Marshal cannot constitutionally also act as a commercial agent for France, 6 Op. Atty. Gen. 409 (1854), and that a retired enlisted member of the armed services who accepts employment with a foreign government will be regarded as holding an office within Art. I, sec. 9,

- 4 -

clause 8 and therefore acceptance would affect that member's entitlement to receive retirement pay. 44 Comp. Gen. 131 and 227 (1964).

On the other hand, the Supreme Court, albeit in a somewhat different context, has defined an office under the United States to be "a public station, or employment, conferred by the appointment of government. The term embraces the ideas of tenure, duration, emolument and duties." United States v. Hartwell, 73 U.S. (6 Wall.) 385, 393 (1967). The Court went on to explain more precisely the tests for determining what constitutes a public officer; viz., he must be appointed pursuant to law, his compensation must be fixed by law; vacating the office of his superior would not have affected the tenure of his position, and his duties must be continuing and permanent, not occasional or temporary. Id.

Applying these tests, the Court subsequently held in United States v. Germaine, 99 U.S. 508 (1878), that civil surgeons appointed by the Commissioner of Pensions to review surgical cases on an infrequent basis were not officers of the United States, although paid by the government for performing these functions, because the duties they performed were only occasional and intermittent.

Similar reasoning would seem applicable here. The primary responsibilities of the Council are to advise the Director with respect to policy matters arising in the administration of the Voluntary Service and Peace Corps programs, to make recommendations for improving the effectiveness of such programs, and to submit an annual report containing its recommendations to the President for transmittal to Congress. Although it is difficult to determine in advance the exact workload and meeting schedule of the Council, if other advisory committees serve as a model, it seems fair to assume the Council's work for the most part will be performed on a sporadic and temporary basis. Thus, it could be asserted that membership on this

- 5 -

Advisory Council does not constitute service in an office of trust or profit under the United States.

Second, it also seems reasonable to argue that Congress has consented, at least implicitedly, to the membership of foreign nationals on this Council, thereby the constitutional prohibitions of the "Nobility" clause are avoided. It seems fairly clear that Congress does not have to manifest its consent expressly in the language of a statute in order to waive the prohibition on the receipt of presents, titles, or emoluments. In 1947, Attorney General Clark, held that the Constitution did not forbid the acceptance of compensation by Weather Bureau employees from a foreign government when those employees had been detailed to foreign countries pursuant to an act of Congress authorizing Weather Bureau cooperation with foreign governments. 40 Op. Atty. Gen. 513 (1947). As noted above, the legislative history of the Domestic Volunteer Service Act clearly seems to contemplate foreign nationals serving as members of the Advisory Council, and this manifestation of intent would seem to constitute the requisite consent.

The oath requirements relating to Civil Service employment also raise legal problems, however not because the Iranian official is prohibited by these laws from taking the oath, but rather because that official may not wish to or may be precluded by Iranian law from taking an oath of allegiance to the United States. 5 U.S.C. 3331 provides:

> An individual, except the President, elected or appointed to an office of honor or profit in the civil service or uniformed services, shall take [an oath of allegiance to the United States].

The "civil service" consists of "all appointive positions in the executive, judicial and legislative branches of the Government of the United States, except positions in the uniformed services." 5 U.S.C. 2101.

- 6 -

As in the case of determining what constitutes an office of trust or profit within the meaning of the "Nobility" clause of the Constitution, there is a split of authority as to what persons are required to take this oath of allegiance. We have been advised, for example, by the Chief Executive Clerk of the White House that the standard practice has been to require appointees to advisory committees to take an oath of office unless such persons are serving without compensation.

In contrast to this unitary approach, the Comptroller General has ruled that, although agents and counsels appointed by the United States to present claims to the Mixed Claims Commission of the United States and Mexico, a commission established by treaty, must take the oath prescribed in Revised Statute § 1757, a predecessor of 5 U.S.C. 3331, the Commissioners themselves did not have to take that oath because under the terms of the treaty they were not considered officers of either government. 6 Comp. Gen. 112 (1926). The oath requirement was interpreted as "confined to officers of the United States in the constitutional sense; i.e., officers whose appointment is vested by law in the President of the United States, the courts of law, or the heads of departments." Id. at 114. The Comptroller General has also held, however, that foreign nationals appointed as professors to the Naval Academy must take this oath of office and that an act which permits employment of nationals does not excuse this requirement. 23 Comp. Gen. 301 (1943).

The Court of Claims has experienced similar difficulty in interpreting this requirement. While, on the one hand, it has held that a disbursing agent of the Treasury Department (Bartlett v. United States, 39 Ct. Cl. 338 (1904)), and a special inspector of foreign steam vessels (Glavey v. United States, 35 Ct. Cl. 242 (1900)) are required to take the prescribed oath; it has, on the other hand, concluded that a clerk to a supervisor of internal revenue, consular agents, and persons employed by Congress to prepare

- 7 -

and edit the publication of statutes are not officers within the meaning of section 3331 or its predecessors. Hedrick v. United States, 16 Ct. Cl. 88 (1880); Sampson v. United States, 30 Ct. Cl. 365 (1895); Drury v. United States, 43 Ct. Cl. 237 (1908).

The formal opinions of the Attorney General have also reached varying conclusions with respect to the proper scope of this requirement, see 13 Op. Atty. Gen. 390 (1871); 12 Op. Atty. Gen. 521 (1868). Yet, perhaps the clearest explanation of the parameters of this issue was provided in an opinion rendered by Attorney General Knox in 1902. In concluding that Marshals of Counselor Courts are not required to take the oath of office prescribed by the predecessor of section 3331, he explained that a "general statute, covering a wide range of subjects, however broad its terms, does not necessarily apply to every subject within that range." 23 Op. Atty. Gen. 608, 609-10 (1902). After noting that the statute in question did not impose any citizenship requirements on such marshals, he reasoned:

> But if not citizens, then they are, as is contemplated, subjects of a foreign nation; and it cannot for a moment be supposed that any law was intended to require of a foreign subject an oath of allegiance to the United States . . . . An alien, desiring to become a citizen, may take an oath of allegiance, but it is not believed that the United States can require or secure an oath of allegiance from one who still retains and owes allegiance to his own country. Such double allegiance is incompatible and cannot exist.
> Id. at 612.

While we believe it is a close question, because the Volunteer Service Act does not impose citizenship requirements on members of the Advisory Council, but does seem to infer their eligibility for such membership, the reasoning of Attorney General Knox is not inapposite to

- 8 -

the present situation and could be applied to conclude that this Iranian national is not required to take an oath of allegiance to the United States.

Of course, it is also important not to overlook the effects this appointment may have upon our treaty obligations and international relations. Although we are not aware of any specific statutory prohibitions against utilizing foreign diplomatic officers in the manner contemplated, such use may be inconsistent with traditional views relating to the non-involvement of diplomatic personnel in the internal affairs of the countries in which they are stationed. For example, Article 41, paragraph 1 of the 1961 Vienna Convention on Diplomatic Relations provides that all persons enjoying diplomatic privileges and immunities "have a duty not to interfere in the internal affairs" of the receiving State. 7 Whitman, Digest of International Law 142 (1970). Appointment of such a foreign national to an advisory committee whose primary function is to evaluate U.S. volunteer programs could be considered by some as an unwarranted intrusion of foreign officials into the internal affairs of the United States.

The resolution of this and other similar problems, including the effect the contemplated appointment could have upon other treaties, protocols, or our diplomatic relations in general would seem to lie within the province of the State Department. Accordingly, you may wish to obtain the views of that Department on these issues.

Finally, because we do not know whether Iranian law has any bearing on the matter, we can necessarily express no opinion thereon.

Robert G. Dixon, Jr.<br>
Assistant Attorney General<br>
Office of Legal Counsel